Antoinette V. Halsey, as administratrix of the estate of her husband, Roderick M. Halsey, appeals from a summary judgment for the defendant A.B. Chance Company in this wrongful death action. Mrs. Halsey claims that Chance negligently or wantonly designed, manufactured, and sold the epoxiglas platform from which her husband, an Alabama Power Company lineman, fell. He died from injuries received in the fall. Mrs. Halsey also alleges in her complaint that Chance negligently or wantonly failed to warn her husband regarding the potential dangers of using a "keeper pin" to splice a chain. Mrs. Halsey seeks to impose on Chance liability under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). The trial court entered a summary judgment for Chance on all counts. We affirm the summary judgment as to the wantonness claims, but as to all other claims we reverse the summary judgment and remand. *Page 608 
The evidence before the trial court when it entered the summary judgment, considered in the light most favorable to the plaintiff, the nonmoving party, indicates that the platform upon which Mr. Halsey was working gave way after Mr. Halsey, attempting to follow the instructions of his foreman, spliced the chain on the platform in order to extend the chain around a utility pole. The chain was used to secure the platform to the pole at a point over 50 feet above the ground. Mr. Halsey spliced the chain by inserting a padlock through the keeper pin, which was located at the end of the chain. The keeper pin later gave way or opened up while Mr. Halsey was working on the outer end of the platform, causing the platform and Mr. Halsey to fall.[1]
First, Mrs. Halsey claims that Chance is liable to her under the AEMLD. We have said:
 "This Court has recently restated the elements of a claim under the [AEMLD]:
 " ' "To establish liability, a plaintiff must show:
 " ' "(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
 " ' "(a) the seller is engaged in the business of selling such a product, and
 " ' "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." '
 Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621
(Ala. 1991) (quoting Casrell v. Altec Indus., Inc., 335 So.2d 128, 132-33 (Ala. 1976)). . . .
 "We note that 'the mere fact that a product has been modified by the buyer subsequent to the sale does not always relieve a manufacturer of liability.' Johnson v. Niagara Machine Tool Works, 555 So.2d 88, 91 (Ala. 1989)."
Williamson v. Tyson Foods, Inc., 626 So.2d 1261, 1263-64
(Ala. 1993) (emphasis omitted). We have also said:
 "An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. Clarke Indus., Inc. v. Home Indemn. Co., 591 So.2d 458, 462 (Ala. 1991); see also Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala. 1981). However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability. Johnson v. Niagara Machine Tool Works, 555 So.2d 88, 91
(Ala. 1989). A manufacturer or seller remains liable if the alteration or modification did not in fact cause the injury, Johnson, 555 So.2d at 91 (quoting Industrial Chem. Fiberglass Corp. v. Hartford Acc. Indemn. Co., 475 So.2d 472, 476
(Ala. 1985)); Bullen v. Roto Finishing Systems, 435 So.2d 1256 (Ala. 1983); Brown v. Terry, 375 So.2d 457 (Ala. 1979), or if the alteration or modification was reasonably foreseeable to the manufacturer or seller. Clarke Indus., 591 So.2d at 462; Beloit Corp. v. Harrell, 339 So.2d 992
(Ala. 1976)."
Sears, Roebuck and Co. v. Harris, 630 So.2d 1018, 1027
(Ala. 1993), cert. denied, 511 U.S. 1128, 114 S.Ct. 2135,128 L.Ed.2d 865 (1994) (emphasis added). The question for the trial court, therefore, was whether a jury could find it foreseeable to Chance that someone would utilize the keeper pin as a load-bearing link when attempting to extend a chain. In entering the summary judgment, the trial court implicitly held that, as a matter of law, it was not foreseeable that someone would use the keeper pin as Mr. Halsey apparently did. We disagree.
Chance contended that Mr. Halsey misused the keeper pin and that it was not foreseeable to Chance that the keeper pin would be used in such a fashion. In opposition to the motion for summary judgment, however, the plaintiff offered the deposition testimony of an expert witness, Dr. Edward Karnes: *Page 609 
 "Q. And what about you as a layperson just looking at this device and that keeper pin, if you were going to get up on a pole and hook that thing up, would you put a padlock through that?
 "A. I think I would. If I couldn't get the padlock and I was going to do the splicing and I couldn't get it through the chain link, I think I probably would.
 "I think I would reasonably assume, again, based on the kind of expertise that I have, that the pin would have the same strength characteristics as the chain, because it's attached to the chain. And I think I especially would, if I had read any of the materials in which that pin is referred to as a safety pin. And that's not on the pin itself, but if I had knowledge that it, little device there [sic], a couple of holes, an attachment, but it looks like it's the end of the chain and it's just, you stick the chain in to kind of keep it out of the work area or just dangling loose."
C.R. at 235-36. Dr. Karnes further testified:
 "Q. Right. Now to your fourth and final opinion, I believe you said that the foreseeability of a user splicing a chain is a given; is that right?
"A. It's a given.
"Q. And what do you base that upon?
 "A. The very fact that the company, A.B. Chance, makes various lengths of extension chains, and the fact that power poles come with different diameters. And more important than that, the concrete poles have variable diameters according to the length of the pole.
 "Q. All right. So in this opinion you're saying the foreseeability of a user splicing the chain is a given from A.B. Chance's perspective?
"A. Certainly.
 "Q. And that applies to any given customer of A.B. Chance's, as well?
"A. Certainly."
". . . .
 "Q. What about the likelihood of someone putting the padlock, a padlock through a keeper pin on a device such as this? What probability do you assign to that?
 "A. I would place a fairly high probability on it, since the keeper pin, or the safety pin as it's called, is attached to the chain, looks like part of the chain.
 "Q. Have you done any study or anything else other than just what you just explained to form that opinion?
 "A. No. And the fact that it was done in this case."
C.R. 245-47. The plaintiff claims that this testimony constitutes substantial evidence requiring the trial court to submit to the jury her claim that Chance was liable under the AEMLD. We agree. In Sears, Roebuck, supra, we stated:
 " ' "When asserting misuse as a defense under [the] AEMLD, the defendant must establish that the plaintiff used the product in some manner different from that intended by the manufacturer. Stated differently, the plaintiff's misuse of the product must not have been 'reasonably foreseeable by the seller or manufacturer.' " ' [Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185 at 1192 (Ala. 1992),] (quoting Edward C. Martin, Alabama's Extended Manufacturer's Liability Doctrine (AEMLD), 13 Am. J. Trial Advoc. 983, 1040 (1990)). Ordinarily, the plaintiffs misuse of an allegedly defective product is a factual issue for the jury. Kelly, 605 So.2d at 1192; Banner Welders, Inc. Iv. Knighton], 425 So.2d [441] at 448 [(Ala. 1982)]; Beloit Corp. v. Harrell, 339 So.2d 992, 997
(Ala. 1976). . . . The question is whether this misuse of the product was reasonably foreseeable by [the defendants]."
630 So.2d 1018, 1028 (Ala. 1993) (emphasis added). The expert testimony offered in opposition to the summary judgment motion constitutes substantial evidence that the misuse of the keeper pin, in this case, was foreseeable. Therefore, the plaintiff's AEMLD claim should have been submitted to the jury.
Mrs. Halsey also claims that Chance negligently or wantonly failed to warn Mr. Halsey of the dangers of using the keeper pin as a load-bearing device. Chance, in support of its motion for summary judgment, claimed that it manufactured extension *Page 610 
chains for use under the very circumstances of this case and that Mr. Halsey should have used one of those chains when he discovered that the platform chain was too short. Instead of using such a chain, however, Mr. Halsey used a padlock to extend the platform chain and hooked that padlock through the keeper pin instead of the last link of the chain. Chance contends that the deposition testimony of several Alabama Power Company linemen offered in support of the motion for summary judgment indicated that the use of a padlock was not accepted practice.
In opposition thereto, Mrs. Halsey points to the report based on Alabama Power Company's investigation of Mr. Halsey's accident, which contains the following statements:
 "The use of an APCo 'X' lock had been used by other Power Delivery-Line Construction employees, and those interviewed stated they assumed this was an acceptable method to splice chain.
 "Prior to installing the work platform at the middle conductor location, this method of splicing the chains was discussed with Halsey by some crew members. Not all crew members on this job were familiar with this method of splicing chain."
C.R. at 262. This portion of the report seems to indicate that at least some linemen had used padlocks to splice chains. Chance claims that even if linemen were using padlocks, hooking one through the keeper pin created an open and obvious danger because, it says, anyone could see from observing the keeper pin that it was not a link in the chain and that it did not have the same strength as a link in the chain.
Dr. Karnes's deposition testimony indicates that because of the location of the keeper pin and the fact that it was of a color similar to that of the chain it was foreseeable that someone would mistake the pin for a load-bearing link. This testimony created a jury question as to whether the danger was open and obvious. Dr. Karnes testified as follows in his deposition:
 "Q. Could you list for me all of the opinions you have formed in this case?
 "A. Sure. My first opinion is that the company, A.B. Chance, failed to exercise reasonable and appropriate care from a human-factors standpoint by failing to provide written instructions with the work platform. And included in such instructions should have been warnings and safety information in addition to strictly instructional information.
 "My second opinion is that A.B. Chance again did not exercise reasonable, appropriate care by failing to provide an on-product warning on the platform that would be available to persons who would be specifically at risk in using the platform.
 "A third opinion is that the company failed to exercise reasonable care, again from the human-factors standpoint, by not providing some type of mechanical accommodation that would have prevented, or at least minimized, the possibility of the safety pin being used in a chain splice, as part of the splice.
 "And there are various alternatives that I've identified from my review of materials, such as perhaps painting it red, the safety pin, or not making it an integral part of the chain, attaching it by a wire or something like that.
 "And the last opinion I have is that the foreseeability of a user splicing the chain is a given. . . .
 "If you do not provide instructions for a piece of equipment or a product, you are leaving the issue of proper use to chance, essentially. Not A.B. Chance, but to chance.
 "If you provide written instructions you have a reliable format that can be used to educate users about proper use of the product and what specifically to do and what not to do when using the product."
C.R. at 306-08. He further testified:
 "Q. So I assume it's your opinion, even if Mr. Halsey knew of this danger, there should have been a warning on there to remind him?
 "A. I think it would have been important to remind him of that, even if he knew that — well, if he knew that putting the lock through the safety pin could fail, I don't think he would have done that. It's that simple. *Page 611 
 "If he knew that he shouldn't be splicing because of possible failures, I think that having that on-product warning would have been quite beneficial for him, not only as a reminder, but as a basis for doing something that would deviate from good worker practices.
 "The problem we have with workers in industry, is that workers try to do the best job available, contrary to what a lot of people think. They're motivated to do good work. And they're motivated to do good work so that they can be promoted and they get approbation from, not only supervisors, but other employees."
C.R. at 249.
By presenting this testimony from her expert witness, Mrs. Halsey presented substantial evidence supporting her negligent-failure-to-warn claim and her negligent-design/manufacture claim; thus, those claims should have been submitted to the jury. We agree with Chance, however, that the record contains no substantial evidence of wantonness.
The summary judgment is affirmed as to the claims alleging wantonness; it is otherwise reversed and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, KENNEDY, and BUTTS, JJ., concur.
HOUSTON, J., concurs specially.
HOOPER, C.J., concurs in part and dissents in part.
MADDOX and SEE, JJ., dissent.
[1] Neither party contests that Chance manufactured extension chains that were to be used when platform chains would not fit around utility poles. Nor is it contested that this accident would not have occurred had Mr. Halsey not used the keeper pin as a loadbearing device.